**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 1:26-cv-24777**

QRSKIN USA, INC.,

*Plaintiff*,

v.

APALOO GMBH, and
APALOO CORP.,

*Defendants*.

# COMPLAINT

Plaintiff, QRSKIN USA, INC. ("Plaintiff" or "QRSkin"), sues Defendants, APALOO GMBH and APALOO CORP. (collectively "Defendants" or "Apaloo"), and states as follows:

## INTRODUCTION

1. This case concerns a foreign manufacturer that relied on its exclusive United States distributor to create an American market where none existed, only to later seize that market after the distributor had borne the risk and invested the effort necessary to build it.

2. For more than five years, QRSkin served as the exclusive distributor of Apaloo's "Moskinto" mosquito-bite patches pursuant to the parties' January 17, 2020 License and Distribution Agreement (the "Agreement"). QRSkin transformed

Moskinto from a brand with no United States presence to a successful product stocked in major national retailers.

3. QRSkin accomplished this success through substantial investments of its own capital and extensive sales and marketing efforts to grow the brand. QRSkin grew Apaloo's business substantially over the life of the Agreement and expanded the network of retailers that stocked Moskinto products.

4. Throughout this relationship, Apaloo praised QRSkin's work, accepted and fulfilled QRSkin's purchase orders, and never contended that QRSkin failed to fulfill its obligations under the Agreement.

5. But that changed once QRSkin had done the hard work of building the market and having established major retailer customers. In January 2026, Apaloo requested that QRSkin provide it with its confidential and hard-won customer account information, which QRSkin provided. Having solicited, confirmed, and accepted payment for a final order, and having obtained QRSkin's customer data, Apaloo purported to terminate the Agreement under a "special termination" right it had no basis to invoke and had already waived.

6. That termination is void under the governing German law. Compounding matters, Apaloo had induced QRSkin to enter into the Agreement and to accept its sales thresholds through material misrepresentations about the product's patent protection, its trademark, and the scale of its global distribution.

7. This is an action for provisional injunctive relief in aid of a pending and/or imminent arbitration before the German Arbitration Institute ("DIS"), seated

in Berlin, Germany, as required by the Agreement. QRSkin does not ask this Court to award damages in connection with its claims, which are reserved for the DIS arbitral tribunal. QRSkin seeks only an order preserving the status quo—the parties' exclusive supply relationship—so that the arbitration is not rendered moot by Defendants' ongoing refusal to supply product.

8. This Court has authority to grant such provisional relief in aid of the parties' agreement to resolve their dispute through arbitration without deciding the merits: the rules governing the arbitration expressly preserve the parties' right to seek interim or conservatory measures from any competent court at any time, and an order preserving the status quo pending the arbitral tribunal's award neither resolves nor prejudices the merits, which remain reserved to the tribunal.[1]

## PARTIES

9. QRSkin is a corporation organized under the laws of the State of Texas, with its principal place of business located at 2100 Valley View Lane, Suite 150, Farmers Branch, Texas. Accordingly, for purposes of diversity jurisdiction, QRSkin is considered a citizen of the State of Texas.

10. Apaloo Corp. is a corporation incorporated under the laws of the State of Florida, and with its principal place of business located at 440 Brickell Avenue, Suite 700, Miami, Florida. Accordingly, for purposes of diversity jurisdiction, Apaloo Corp. is considered a citizen of the State of Florida.

---

[1] DIS Arbitration Rules expressly permit a party to request interim or conservatory measures from any competent court at any time, independent of the arbitration. *See* 2018 DIS Arbitration Rules, Art. 25.3.

11. Apaloo GmbH is a German *Gesellschaft mit beschränkter Haftung* ("GmbH"), which is a German limited liability company, incorporated in Germany, with its principal place of business in Germany. Apaloo GmbH's Managing Director is Andreas Jetter.

12. For purposes of diversity jurisdiction, Apaloo GmbH is akin to a domestic U.S. corporation. But if characterized as being akin to a domestic U.S. limited liability company for purposes of diversity jurisdiction, its sole member is Apaloo Holding GmbH.

13. Apaloo Holding GmbH has two members: Nica Holdings GmbH and MS Fund GmbH & Co. KG. A *Kommanditgesellschaft* ("KG") is a limited partnership business structure in which two or more individuals or companies run a business under a common company. For purposes of diversity jurisdiction, MS Fund GmbH & Co. KG is akin to a U.S. partnership.

14. Nica Holdings GmbH has one member: PALU Holding GmbH. PALU Holding has two members: Andreas Jetter ("Jetter") and Davina Müller ("Müller"). For purposes of diversity jurisdiction, and upon information and belief, Jetter and Müller are citizens of Germany.

15. MS Fund GmbH & Co. KG has the following constituent participants: (i) S&L Verwaltungs GmbH, as its personally liable general partner, and (ii) Dr. Steiner Digital Beteiligungsverwaltungsgesellschaft mbH & Co. KG, (iii) Koch Beteiligungs GmbH, (iv) Lanz Beteiligungs GmbH, (v) Meyer Ventures GmbH, (vi) Nichau Family Office GmbH, (vii) SL Founder GmbH & Co. KG, (viii) Schaberger

Beteiligungs GmbH, (ix) Vidia Ventures GmbH, and (x) Wiegand Beteiligungs GmbH as limited partners. Vidia Ventures GmbH has two members: Johanna Struthmann and Dr. Stephan Rosarius. For purposes of diversity jurisdiction, and upon information and belief, Struthmann and Rosarius are citizens of Germany.

16. Koch Beteiligungs GmbH has three members: Andrea Susanne Koch, Florian Tim Koch, and Julia Elisabeth Koch. Upon information and belief, each is a citizen of Germany.

17. Meyer Ventures GmbH has one member: Florian Meyer. For purposes of diversity jurisdiction, and upon information and belief, Meyer is a citizen of Germany.

18. Nichau Family Office GmbH has two members: Christoph Nichau and Malaika Nichau. For purposes of diversity jurisdiction, and upon information and belief, Christoph Nichau and Malaika Nichau are citizens of Germany.

19. Wiegand Beteiligungs GmbH has two members: Alexander Wiegand and Wiegand Beteiligungs GmbH.[2] For purposes of diversity jurisdiction, and upon information and belief, Wiegand is a citizen of Germany.

20. S&L Verwaltungs GmbH has two members: Schaberger Beteiligungs GmbH and Lanz Beteiligungs GmbH. Schaberger Beteiligungs GmbH has one member: Peter-Daniel Schaberger. Lanz Beteiligungs GmbH has one member:

---

[2] Upon information and belief, the German public registry information lists Wiegand Beteiligungs GmbH as a member of itself. To the extent this information is registration information is a scrivener's error, the parties remain diverse for purposes of this Court's jurisdiction.

Dominik Maximilian Lanz. For purposes of diversity jurisdiction, and upon information and belief, Peter-Daniel Schaberger and Dominik Lanz are citizens of Germany.

21. SL Founder GmbH & Co. KG has three constituent participants: S&L Verwaltungs GmbH, as general partner, and Lanz Beteiligungs GmbH and Schaberger Beteiligungs GmbH, as limited partners.

22. Dr. Steiner Digital Beteiligungsverwaltungsgesellschaft mbH & Co., KG has three partners: Global Wines Service GmbH, Dr. Steiner Holding Aktiengesellschaft, and Werner Dreesbach Holding GmbH.

23. Global Wines Service GmbH has one member: Steiner Gruppe GmbH. Steiner Gruppe GmbH has one member: Dr. Steiner Holding Aktiengesellschaft.

24. Dr. Steiner Holding Aktiengesellschaft is a German joint stock company with its registered office in Berlin, Germany. For purposes of diversity jurisdiction, it is akin to a U.S. corporation and therefore, a citizen of Germany.

25. Werner Dreesbach Holding GmbH has one member: Junius Holding GmbH. Junius Holding GmbH has two members: NML Capital GmbH and DB Investment GmbH. NML Capital GmbH has one member: Dr. Nike Michaela Lohmann. For purposes of diversity jurisdiction, and upon information and belief, Dr. Lohmann is a citizen of Germany. DB Investment GmbH has two members: Dr. Suska Dreesbach-Bundy and DB Family KG. DB Family KG is a family-owned limited partnership with the following partners: Georg Nikolaus Bundy, Johan Georg Bundy, Anton Georg Bundy, and Enno Georg Bundy. For purposes of diversity jurisdiction,

and upon information and belief, Dr. Dreesbach-Bundy, Georg Bundy, Johan Bundy, Anton Bundy, and Enno Bundy are citizens of Germany.

26. For the Court's ease of reference, the complete ownership structure of Defendant Apaloo GmbH, tracing each member and constituent partner through every intermediate entity to its ultimate natural-person owners, is depicted in the ownership chart attached hereto as **Exhibit 1** and incorporated herein by reference. As set forth in the preceding paragraphs and illustrated in Exhibit A, every member of Apaloo GmbH is, upon information and belief, a citizen of Germany, and no member is a citizen of any State of the United States. Accordingly, Apaloo GmbH is a citizen of Germany for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because: (a) the amount in controversy exceeds $75,000.00, exclusive of interest and costs; and (b) there is diversity of citizenship between the parties because QRSkin is considered a citizen of the State of Texas, Apaloo GmbH is a citizen of Germany (as all of its members are German citizens), and Apaloo Corp. is a citizen of the State of Florida.

28. This Court has personal jurisdiction over Apaloo Corp. because at all relevant times it has been operating, conducting, engaging in, or carrying on a business or business venture in the State of Florida, and has an officer in this state. *See* § 48.193(1)(a)(1), Fla. Stat. This Court also has personal jurisdiction over Apaloo Corp. because it is engaged in substantial and not isolated activity within Florida,

whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity. *See* § 48.193(2), Fla. Stat.

29. This Court has personal jurisdiction over Apaloo GmbH because it is engaged in substantial and not isolated activity within Florida, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity. *See* § 48.193(2), Fla. Stat. Moreover, as alleged *supra*, Apaloo GmbH exercises sufficient control over Apaloo Corp., its subsidiary, to render Apaloo Corp. an agent of Apaloo GmbH.

30. The Court's exercise of personal jurisdiction over Apaloo GmbH and Apaloo Corp. does not offend traditional notions of fair play and substantial justice and is consistent with the Fourteenth Amendment's Due Process Clause.

31. Venue is proper pursuant to 28 U.S.C. § 1391 because Apaloo Corp. is a citizen of the State of Florida and maintains its principal office in this district.

32. All conditions precedent to QRSkin's initiation of this action have been waived or performed.

## GENERAL ALLEGATIONS

### A) QRSkin and Apaloo GmbH execute the Agreement, which made QRSkin the exclusive United States distributor of Moskinto products.

33. Apaloo GmbH is the owner of the brand "Moskinto." According to Apaloo, "Moskinto patches use a patented grid structure that gently lifts the skin to relieve the pressure caused by mosquito bite swelling. This physical action helps

drain the histamine-filled fluid from the bite area, reducing itching and swelling without any drugs or chemicals."[3]

34. When the parties executed the Agreement, Moskinto did not have a brand or sales presence in the United States. Prior to the Agreement, Apaloo GmbH's distribution was focused on Germany and surrounding countries in Europe, and it was looking for a distributor in the United States.

35. In or around 2019, QRSkin and Apaloo GmbH began discussing an exclusive distribution arrangement. Apaloo GmbH presented QRSkin with its own pre-prepared standard form License and Distribution Agreement, drafted by Apaloo in German and English. QRSkin's input was limited to commercial details, such as prospective points of sale; the terms of the Agreement, including Section 8.2, were prepared entirely by Apaloo and were not negotiated.

36. On January 17, 2020, Apaloo GmbH and Plaintiff executed the Agreement. A true and correct copy of the executed Agreement is attached and incorporated as **Exhibit 2**. The Agreement was executed in English and German, although the German language controls interpretation of the Agreement.

37. In the Agreement, Apaloo GmbH was referred to as the "Licensor" and QRSkin was referred to as the "Licensee." [Ex. B at 1]. The Agreement defined the "Moskinto" patch as the "Licensed Product." [*Id.* at § 1.2].

38. Under the Agreement, Apaloo GmbH granted Plaintiff the exclusive right to use the licensed Moskinto brand to introduce, advertise, offer, and sell the

---

[3] *See https://moskinto.com/#works* (last accessed July 1, 2026).

licensed products during the duration of the Agreement throughout the entire United States (the "Licensed Territory"). [*Id.* at § 2.1].

39. Apaloo GmbH agreed that it would supply QRSkin with Moskinto products, with supply made according to availability. [*Id.* at § 3.1].

40. Apaloo further agreed that its supply of Moskinto products was "fundamentally exclusive" to QRSkin. This meant that, with limited exceptions, Apaloo GmbH "shall not supply any third party in the Licensed Territory." [*Id.* at § 4.1].

41. The Agreement set the purchase price at which Apaloo GmbH would sell Moskinto patches to QRSkin. The price was fixed at $1.64 per box of 24 Moskinto patches and $3.96 per container of 42 Moskinto patches, subject to a unilateral price increase by Apaloo GmbH of no more than 4% per increase, effective 60 days after notice. [*Id.* at § 5.1].

42. The Agreement established a fixed term of five years, measured from the date the parties executed the Agreement. [*Id.* at § 8.1]. The Agreement also provided that the contract would automatically renew for two-year terms unless a party gave notice of at least three months prior to expiration of the contract. [*Id.*].

43. The Agreement also provided Apaloo GmbH with a "special termination right" if QRSkin did not meet certain minimum purchase requirements:

> The Licensor has a special termination right if a minimum purchase quantity for the Licensed Products if a minimum turnover for the contract products of USD 328,000 in the first contract year, USD 1,300,000 in the second contract year, USD 3,200,000 in the third contract year, USD 6,500,000 in the fourth contract year and USD 12,000,000 in the fifth contract year is not achieved. The special

> termination right can only be terminated by the Licensor if the minimum turnover in subsequent years is less than USD 12,000,000 per year, the expiration of each contract year is declared in writing no later than 31/01 of the following year. The termination becomes valid upon receipt by the Licensee.

[*Id.* at § 8.2].

44. The Agreement stated that disputes arising out of or in connection with the Agreement or its validity "shall be finally settled in accordance with the Arbitration Rules of the German Arbitration Institute (DIS) without recourse to the ordinary courts of law," before a tribunal of three arbitrators, seated in Berlin, Germany, conducted in the German language, and applying the laws of Germany. [*Id.* at § 9.3].

**B) For more than five years, QRSkin builds Moskinto's U.S. market while Apaloo praises QRSkin's work and reliably fills its orders.**

45. Over five years, QRSkin developed Moskinto's United States market, generating significant accounts and investing its own capital to grow the Moskinto brand in the United States.

46. Throughout the duration of the Agreement, QRSkin worked closely with Apaloo GmbH, sharing its marketing plans, distribution efforts, and budgets related to expanding Moskinto in the United States.

47. At times, QRSkin shared confidential data with Apaloo GmbH, showing its increased revenue and accounts. QRSkin also regularly advised Apaloo GmbH on its successes, as well as the challenges it encountered in developing the brand in the United States.

48. Over time, QRSkin made significant progress expanding the Moskinto brand across the United States and securing valuable customer relationships. Apaloo GmbH repeatedly affirmed its satisfaction with QRSkin's efforts in expanding distribution of Moskinto in the United States. For example, on August 17, 2024, QRSkin reported that it obtained approval from Walgreens to serve as a supplier. Apaloo GmbH's Managing Director, Jetter, responded, "Well done." QRSkin also reported that it had completed a successful meeting with a Walmart representative, and Jetter responded, "Sounds great."

49. Similarly, on September 23, 2024, QRSkin reported that it had secured distribution with the fourth largest convenience store group in the United States. A senior Apaloo GmbH employee responded, "Are you serious?????? Wow!!!"

50. For approximately the next fourteen months, QRSkin continued to secure additional distribution deals with other major retailers in the United States. Over the life of the Agreement, QRSkin distributed to Buc-ee's, Ace Hardware, CVS, and Wegmans. QRSkin also sold Moskinto products through major Internet commerce sites including Amazon and Walmart. Apaloo GmbH continued to accept purchase orders placed by Plaintiff and fulfilled those orders.

51. Between 2021 and 2026, QRSkin placed approximately 19 purchase orders for Moskinto products from Apaloo. QRSkin's annual purchases from Apaloo grew substantially over the life of the Agreement, reflecting QRSkin's successful efforts in expanding distribution and brand recognition within the United States.

52. Prior to September 8, 2025, Apaloo GmbH never advised QRSkin that it intended to invoke the special termination provision of the Agreement. To the contrary, Apaloo GmbH informed QRSkin that it would not seek to terminate the contract even though QRSkin was not meeting the minimum purchase requirements. On June 13, 2025, Jetter emailed QRSkin and advised that, even QRSkin had not met the minimum purchase requirements, it was not the intention of Apaloo GmbH to terminate the contract. Indeed, prior to June 11, 2026, Apaloo GmbH reliably supplied QRSkin with Moskinto products whenever QRSkin submitted orders.

53. Indeed, on October 8, 2025, Apaloo GmbH emailed QRSkin to confirm its orders for the 2026 season:

> It would be good if the order could be confirmed by mid-October, as the factory is already very busy at the moment. We will then be able to send the goods by sea freight and deliver them on time.

(Oct. 8, 2025, email from D. Müller).

### C) After QRSkin builds the U.S. market, Apaloo moves to take it over—extracting QRSkin's customer data and then terminating the Agreement.

54. Despite QRSkin's successes in distributing Moskinto in the United States, on September 8, 2025, Jetter wrote to QRSkin and threatened to terminate the Agreement pursuant to Section 8.2. But Apaloo GmbH did not terminate the Agreement. Instead, Apaloo GmbH urged QRSkin to continue making additional purchases from Apaloo.

55. While QRSkin and Apaloo GmbH continued to operate under the Agreement, Apaloo GmbH indicated that it wanted to modify the distribution

relationship with QRSkin. On October 23, 2025, Jetter proposed a new "framework" where new customers secured by QRSkin would be managed by Apaloo. The new "framework" also proposed terminating QRSkin's exclusive distribution rights.

56. On November 1, 2025, QRSkin informed Apaloo GmbH that it would not agree to the proposed structure. QRSkin advised Apaloo GmbH that it would, however, consider a structured buyout that would transition the United States business developed by QRSkin to Apaloo GmbH.

57. On November 19, 2025, Jetter wrote to QRSkin that "Apaloo wants QRSKIN to continue operating your business in the U.S. market, exactly as outlined and consistently stated in our earlier emails."

58. While QRSkin and Apaloo GmbH continued to negotiate, Apaloo GmbH continued to solicit orders from QRSkin. On December 8, 2025, Jetter wrote to QRSkin:

> **If you let us know what you intend to order** (I assume this is becoming time-critical), we can try to find an interim solution for those orders. However, it is unclear to me whether you need to place an order at all and in what quantities, as I do not know your current inventory levels or order situation. What I can tell you is that our production capacity is fully booked until Chinese New Year, and **we need to act now if you want the goods to be produced in** February. Please provide the following information: Which products (order) do you urgently need, and by when? **Do you already have delivery deadlines for CVS, Buc-ee's, or other major customers?** In parallel to this, we can continue working on the framework once we receive your comments. Thank you for your understanding.

(Dec. 8, 2025, email from A. Jetter) (emphasis added).

59. On December 13, 2025, Jetter further advised QRSkin that based on timing, "we [Apaloo] need to **initiate the order immediately – effective now**."

(emphasis in original). On December 15, 2025, QRSkin placed its order with Apaloo, which Jetter confirmed on December 16, 2025.

60. During a January 13, 2026, meeting with QRSkin, an Apaloo GmbH representative stated that it needed to review QRSkin's "current customer list" and "late-stage pipeline." The representative insisted that the documents were "essential" and that Apaloo GmbH could not "move forward" with any new framework with QRSkin until it reviewed the information.

61. On January 16, 2026, QRSkin complied with this request and provided the requested information to Apaloo GmbH. The data disclosed included comprehensive and sensitive commercial information: the entire list of QRSkin's active retail accounts, the pricing and payment terms associated with those accounts, and identification of the retailers with whom QRSkin was engaged in late-stage supply negotiations.

62. When QRSkin followed up with Apaloo GmbH to confirm that it received the information, Jetter, on behalf of Apaloo GmbH, sent QRSkin a notice of termination:

> As managing director of Apaloo GmbH . . . I am exercising our special termination right on behalf of Apaloo GmbH and terminating the "License and Distribution Agreement for the "Moskinto" brand and Moskinto products dated 17 January 2020, between you and Apaloo GmbH in accordance with Section 8 (2) of this License and Distribution Agreement. The termination shall take effect upon receipt of this notice by you.

(Jan. 27, 2026 letter from Jetter)[4].

[4] The termination letter is dated January 20, 2026, but was not delivered to QRSkin until January 27, 2026.

63. Jetter delivered the termination letter by email. Jetter's email invited QRSkin to "continue working without a formal contract" and to "continue placing orders and serving your customers under the existing commercial conditions."

64. Apaloo also continued to perform under the Agreement following the purported January 27 2026, termination. Apaloo delivered the December purchase order in installments through approximately April 15, 2026, and accepted QRSkin's final payment on June 10, 2026.

65. On June 1, 2026, QRSkin submitted an order to Apaloo for additional Moskinto products. On June 11, 2026, one day after QRSkin made its final payment owing on the December 2025 order, Apaloo rejected the order based on its purported termination of the Agreement.

**D) Apaloo competes directly against QRSkin in QRSkin's own retail and online channels.**

66. Early in the parties' relationship, QRSkin developed and operated a sales channel for Moskinto products through Walmart's online marketplace.

67. On January 30, 2025, Jetter emailed QRSkin, requesting its per-SKU sales figures for Walmart and Amazon. A SKU, or Stock Keeping Unit, is a unique alphanumeric code that a retailer creates internally to identify and track a specific product variant in its inventory. Jetter framed his request for the sales volume information as intended to assist QRSkin with expanding its business.

68. During the January 13, 2026 meeting between QRSkin and Apaloo GmbH, a representative of Apaloo GmbH reassured QRSkin that its current accounts

were protected, stating, "We [Apaloo] all agree on the current belong[ing] to [QRSkin] . . . We [Apaloo] are not trying to take over those accounts." Moreover, Apaloo GmbH's representative stated that Apaloo would "never ever contact somebody without you being aware" and that conducting business "behind your [QRSkin's] back" would be "perfectly unacceptable."

69. Nevertheless, QRSkin later discovered that Apaloo was itself selling Moskinto products directly to Walmart, and that QRSkin's distributor information had been removed from the product packaging.

70. An Apaloo GmbH representative also acknowledged on January 28, 2026—one day after delivery of the termination letter—that he had already engaged with Walmart, on behalf of Apaloo.

71. On or about February 15, 2026, approximately three weeks after Apaloo's purported termination, QRSkin discovered that Moskinto 12-count boxes were being sold in a Walmart store. The 12-count box is the same product that QRSkin ordered on June 1, 2026, and which Apaloo refused to sell to QRSkin on June 11, 2026. Thus, Apaloo now directly stocks Walmart with the same product that it refuses to supply its exclusive distributor.

72. Apaloo's conduct also confirms its intent and its means to take over QRSkin's United States market: having obtained QRSkin's sales data on the representation that it would help QRSkin "argue with Walmart," Apaloo used that information to sell directly, in QRSkin's own channel, the product it simultaneously withholds from QRSkin.

73. Apaloo also now advertises on its website, Moskinto.com, Moskinto products for sale through Amazon, CVS, and Walmart in the United States. These are customer accounts developed by QRSkin.

**E) Plaintiff discovers that inducements to execute the Agreement and to maintain performance were based on false representations by Apaloo GmbH's Managing Director.**

74. To induce QRSkin to execute the Agreement and to maintain performance, Apaloo GmbH's Managing Director, Jetter, made critical representations that QRSkin relied upon in deciding to enter into the Agreement and to agree to the minimum purchase requirement of § 8.2.

75. First, Jetter represented to QRSkin that Moskinto was patented or that a patent was forthcoming in the United States. In calculating the commercial value of the relationship and in agreeing to the minimum sales thresholds, QRSkin relied upon the patented nature of the product. Apaloo filed a Patent Cooperation Treaty application designating the U.S. on December 22, 2021, and entered the U.S. national stage on June 19, 2023 (U.S. Application No. 18/258,297). This remains a pending application that the United States Patent and Trademark Office ("USPTO") has not yet granted.

76. Second, Jetter represented to QRSkin that Moskinto was already being distributed in approximately 50,000 "doors" (*i.e.*, individual stores) globally. QRSkin relied on this representation as a benchmark for the global commercial credibility of the brand and for Plaintiff's estimates on potential U.S. growth and, therefore,

establishing the minimum purchase requirements for the Agreement.[5] Jetter later admitted to QRSkin's representatives that the 50,000 doors representation was false and was merely marketing.

77. Third, Jetter represented to QRSkin that Moskinto's product artwork and visual identity were original works created by Apaloo GmbH and specifically, that Jetter himself had drawn the mosquito artwork used by the brand. That representation was false. On February 21, 2025, Jetter admitted in an email to QRSkin that Apaloo GmbH had merely licensed the image from a third-party stock-image source, and that the Moskinto trademark was "not very strong in the USA." Jetter further urged QRSkin not to raise the issue unless necessary, acknowledging that although Apaloo GmbH's equity investor had received this information during due diligence, it may not have recognized the problem.

**F) Apaloo GmbH's termination of the Agreement is unenforceable and void under German law.**

78. Apaloo GmbH's purported January 27, 2026, termination based on its Section 8.2 termination right was invalid for several reasons. First, Apaloo GmbH waived the minimum threshold purchase requirements for years, and never objected to QRSkin's orders until June 11, 2026. Second, the thresholds were based on misrepresentations regarding U.S. patent protection, the strength of Moskinto's branded artwork, and inflated claims of existing global distribution. Moreover, the

[5] QRSkin relied in good faith on Jetter and Apaloo GmbH's representations regarding Moskinto's distribution across 50,000 stores, and at times, repeated this data in its own publications and communications.

Agreement called for minimum purchases that exceeded Apaloo GmbH's production capabilities and total volume, which made compliance impossible.

79. The special termination clause under Section 8.2 is also void under German law, which governs the Agreement. Under German law, Section 8.2 is invalid if it unreasonably disadvantages one of the contracting parties. Minimum distribution target terms are considered unreasonably disadvantageous where the clause permits termination even if the distributor undertakes best efforts but fails to meet the targets. Section 8.2 permitted Apaloo GmbH to terminate the Agreement regardless of whether QRSkin exercised reasonable or best efforts to achieve the minimum turnover obligations. Because the clause imposed an absolute termination right untethered to QRSkin's diligence or responsibility for the failure, it constitutes an invalid term under German law.

80. Therefore, because Apaloo GmbH's exercise of the special termination clause was invalid, Apaloo GmbH was required to fulfill QRSkin's June 1, 2026, purchase order.

**G) Apaloo Corp. is an agent of Apaloo GmbH**

81. At all relevant times, Apaloo Corp. was an agent of Apaloo GmbH. Apaloo GmbH exercised operational control over Apaloo Corp. such that it exercised day-to-day control of the internal affairs and basic operations of Apaloo Corp.

82. The amount of control exercised by Apaloo GmbH over Apaloo Corp. was very significant in that Apaloo Corp. conducted business solely for Apaloo GmbH.

83. At all relevant times, the Managing Director of Apaloo GmbH was Jetter. Jetter was also the President of Apaloo Corp. and therefore controlled its day-to-day operations.

84. Although the Agreement stated that Apaloo GmbH sold Moskinto products to QRSkin, Apaloo GmbH directed QRSkin to send its orders to Apaloo Corp., which, in turn, invoiced the purchases to QRSkin.

85. Apaloo Corp. also served as the importer of record for the Moskinto products that QRSkin purchased. Apaloo Corp., on behalf of Apaloo GmbH, managed shipping, importation, and transportation of all purchased products to QRSkin.

86. Apaloo Corp. and Apaloo GmbH also operate the Moskinto.com website to promote Moskinto products. The Moskinto website claims that "Moskinto is a brand of Apaloo Corp, which has been developing innovative health products since 2010."[6] Moskinto is a registered trademark (Registration No. 5319639) of Apaloo GmbH according to the USPTO. Moreover, Apaloo Corp. was not incorporated until January 15, 2019.

87. Product packaging for Moskinto products also states that the product is manufactured for Apaloo Corp.

**H) Irreparable harm and grounds for provisional injunctive relief in aid of arbitration.**

88. This action seeks only provisional injunctive relief in aid of the pending and/or imminent DIS arbitration, to preserve the status quo—the parties' exclusive supply relationship—until the arbitral tribunal renders its award. QRSkin does not

[6] https://moskinto.com/#about (last accessed June 30, 2026).

ask this Court to decide the merits, which are reserved to the tribunal, and the DIS Rules expressly permit a party to apply to a court of competent jurisdiction for interim measures of protection.

89. QRSkin is likely to succeed on the merits of its claims. Apaloo GmbH accepted and filled QRSkin's orders for years without ever invoking the Section 8.2 minimum-turnover thresholds, thereby waiving them; the thresholds themselves were procured by misrepresentation and as pleaded above, the purported special termination is void under the governing German law.

90. QRSkin will suffer immediate and irreparable harm absent injunctive relief. Sales of Moskinto-brand products—together with a companion insect-repellent product that QRSkin distributed alongside the Moskinto patches until 2025—have historically accounted for substantially all of QRSkin's revenue, and the Moskinto distributorship is QRSkin's only line of business. While QRSkin has from time-to-time handled incidental sales or programs involving other products, none of that activity constitutes a line of business or generates revenue capable of sustaining QRSkin's operations. With no products to sell, QRSkin cannot fulfill existing purchase orders, cannot service its retail accounts, cannot meet payroll or fixed obligations, and cannot continue operating.

91. Apaloo GmbH's refusal to supply Moskinto product, coupled with its move to sell directly to the very retailers QRSkin developed, also threatens the permanent loss of QRSkin's exclusive United States distributorship, its hard-won customer relationships with national retailers such as Buc-ee's, Ace Hardware, CVS,

Wegmans, and the goodwill and market position QRSkin built over five years. Such losses to customer relationships, goodwill, and market position are inherently difficult to quantify and cannot be adequately remedied by a later award of money.

92. QRSkin has no adequate remedy at law. Because QRSkin's retail accounts require continuous, reliable supply, each unfilled order risks the loss of shelf space and customer relationships to Apaloo GmbH or to competing products—harm that money damages assessed after the arbitration cannot restore.

93. The balance of hardships favors QRSkin. An order preserving the parties' pre-dispute supply relationship merely requires Apaloo GmbH to continue performing as it did for more than five years and to fill orders placed by QRSkin, whereas denial of relief would allow Apaloo GmbH to appropriate QRSkin's market and customers before the tribunal can rule.

94. The public interest favors injunctive relief. The requested order enforces the parties' bargained-for arbitration agreement by preserving the status quo so the DIS tribunal can resolve the dispute, and it protects the settled expectations of the retail customers who rely on a consistent supply of Moskinto products.

**<u>Count One – Breach of Contract</u>**
**Against Apaloo GmbH and Apaloo Corp.**

95. QRSkin re-alleges and incorporates Paragraphs 1 through 95 as if fully set forth herein.

96. QRSkin and Apaloo GmbH entered into the Agreement.

97. The Agreement was a valid and enforceable Agreement.

98. QRSkin performed its obligations under the Agreement.

99. Apaloo GmbH materially breached the Agreement by terminating the Agreement on January 27, 2026, and refusing to fulfill the June 1, 2026 purchase order submitted by QRSkin.

100. Because Apaloo Corp. is merely an agent through which Apaloo GmbH conducts business, without any semblance of individual identity, Apaloo Corp. and Apaloo GmbH are jointly responsible for the material breach of the Agreement. Moreover, under German law, Apaloo Corp. joined the Agreement by implied consent through its actions.

101. As a direct and proximate result of Apaloo GmbH's material breach of the Agreement, QRSkin has suffered and continues to suffer irreparable harm—including loss of an exclusive distributorship, customer goodwill, and market position that are difficult to quantify and not fully compensable in money damages—by being unable to sell Moskinto products to its customers and jeopardizing its accounts.

102. The value of this business exceeds $75,000.

**<u>Count Two – Breach of Implied Covenant of Good Faith and Fair Dealing</u>**
**Against Apaloo GmbH and Apaloo Corp.**

103. QRSkin re-alleges and incorporates Paragraphs 1 through 95 as if fully set forth herein.

104. QRSkin and Apaloo GmbH entered into the Agreement.

105. The Agreement was a valid and enforceable Agreement.

106. QRSkin performed its obligations under the Agreement.

107. Apaloo had discretion under the termination provision, but failed to exercise it in good faith and consistent with the parties' reasonable expectations. Specifically, the Agreement vested Apaloo GmbH with a discretionary "special termination right" under Section 8.2 that turned on QRSkin's attainment of escalating annual minimum turnover targets. Even assuming those targets were not met, Apaloo GmbH's exercise of that discretion was neither honest nor consistent with the parties' reasonable expectations. Instead, Apaloo GmbH with the improper purpose of appropriating for itself the United States market and customer relationships that QRSkin had spent more than five years and invested hundreds of thousands of dollars developing.

108. Apaloo GmbH exercised that discretion in bad faith. For years it accepted and filled QRSkin's purchase orders without ever suggesting that the Agreement might be terminated based on purported minimum order targets being unsatisfied, praised QRSkin's market-building work, and repeatedly affirmed its intention that QRSkin "continue operating [its] business in the U.S. market." Apaloo GmbH thereby led QRSkin reasonably to expect that the special termination right would not be invoked based on turnover shortfalls that Apaloo GmbH had long overlooked and, in fact, was based on its misrepresentations to QRSkin.

109. Apaloo GmbH then reversed course only after inducing QRSkin to place a critical 2026-season order and to hand over its confidential, hard-won customer account information—which Apaloo GmbH solicited in January 2026—and, having obtained that data, purported to invoke the special termination right days later. The

timing and sequence demonstrate that Apaloo GmbH exercised its contractual discretion not to protect any legitimate interest in minimum volumes, but to capture QRSkin's customers and goodwill for itself.

110. In so doing, Apaloo GmbH deprived QRSkin of the fruits of the Agreement and frustrated the parties' reasonable expectation that QRSkin would remain the exclusive United States distributor of Moskinto products for the contract term and any renewal, and would retain the benefit of the distribution network and customer relationships it had developed.

111. Accordingly, Apaloo GmbH breached the implied covenant of good faith and fair dealing by relying upon the minimum purchase quantities in terminating the Agreement on January 27, 2026, and refusing to fulfill the June 1, 2026, purchase order submitted by QRSkin.

112. Because Apaloo Corp. is merely an agent through which Apaloo GmbH conducts business, without any semblance of individual identity, Apaloo Corp. and Apaloo GmbH are jointly responsible for the material breach of the Agreement. Moreover, under German law, Apaloo Corp. joined the Agreement by implied consent through its actions.

113. As a direct and proximate result of Apaloo GmbH's material breach of the implied covenant of good faith and fair dealing, QRSkin has suffered and continues to suffer irreparable harm—including loss of an exclusive distributorship, customer goodwill, and market position that are difficult to quantify and not fully

compensable in money damages—by being unable to sell Moskinto products to its customers and jeopardizing its accounts.

114. The value of this business exceeds $75,000.

## PRAYER FOR RELIEF

**WHEREFORE**, QRSkin USA, Inc. demands the following relief:

(a) Issue a preliminary injunction, in aid of the imminent arbitration before the German Arbitration Institute (DIS), preserving the status quo pending the arbitral tribunal's final determination, by enjoining Defendants, and their officers, agents, servants, employees, and all persons acting in concert with them, from treating the License and Distribution Agreement as terminated and from refusing to supply Moskinto products to QRSkin on the terms set forth in the Agreement;

(b) Order Defendants, pending the arbitral tribunal's final determination, to continue to accept and fill QRSkin's purchase orders for Moskinto products in accordance with the Agreement, including QRSkin's outstanding purchase order, so that the arbitration is not rendered moot by Defendants' refusal to supply product;

(c) Enjoin Defendants, pending the arbitral tribunal's final determination, from selling, offering, or supplying Moskinto products, whether directly or through third parties, to customers or retailers within the Licensed Territory in derogation of QRSkin's exclusive distribution rights under the Agreement;

(d) Enjoin Defendants, pending the arbitral tribunal's final determination, from using or further disclosing the confidential customer account information that QRSkin provided to Apaloo GmbH, and from soliciting or servicing the customer

accounts developed by QRSkin, in derogation of QRSkin's rights under the Agreement; and

(e) Grant such other and further relief as the Court deems just and proper, all without prejudice to the claims and remedies, including damages, reserved to the DIS arbitral tribunal.

Dated: July 13, 2026

Respectfully submitted,

**STUMPHAUZER KOLAYA**
**& SLOMAN, PLLC**
2 S. Biscayne Blvd., Ste. 1600
Miami, FL 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: *_/s/ Timothy A. Kolaya_*
Timothy A. Kolaya (FBN: 056140)
tkolaya@sknlaw.com
Matthew DellaBetta (FBN: 1031216)
mdellabetta@sknlaw.com