**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:26-cv-24777**

**QRSKIN USA, INC.,**

**Plaintiff,**

**v.**

**APALOO GMBH, and**
**APALOO CORP.,**

**Defendants.**
________________________________________/

**DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, MOTION TO DISMISS PURSUANT TO RULES 12(b)(2) and 12(b)(6)**

Defendants Apaloo GMBH and Apaloo Corp., pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. (the "Convention") and 9 U.S.C. §§ 201 *et seq*., move to compel arbitration. In the alternative, Defendants move to dismiss pursuant to R. 12(b)(2) and (6).

**INTRODUCTION**

Plaintiff's claims and its requested relief belong in arbitration. They are based on a License and Distribution Agreement with Defendant Apaloo GmbH that commits "all disputes arising out of or in connection with this contract or its validity" to arbitration before the German Arbitration Institute ("DIS"). ECF No. 1-2 (hereinafter the "Agreement"), at § 9.3. QRSkin does not dispute that clause's validity or scope. Instead, under the label of preserving the "status quo," it effectively asks this Court to decide the arbitrable merits itself: whether Apaloo GmbH's termination of the Agreement was valid. It requests an order requiring Defendants to perform the Agreement as if it were still valid nearly seven months after termination. That request cannot be squared with the parties' arbitration agreement, which the Convention and the FAA require this Court to enforce.

QRSkin cannot avoid that result by naming Apaloo Corp. as a co-defendant. Apaloo Corp. is not a signatory to the Agreement, but QRSkin's claims against it rest on the same Agreement, the same termination, the same conduct alleged against Apaloo GmbH, and QRSkin seeks identical relief against both. *See* ECF No. 1 (hereinafter "Compl"), at ¶¶ 81–87, 95–114. Having invoked the Agreement as the source of the rights it asserts against Apaloo Corp., QRSkin is equitably estopped from disclaiming that Agreement's arbitration clause.

Nor does QRSkin's characterization of its requested relief as "in aid of arbitration" change the analysis. That relief is available only to preserve the arbitral process from becoming a hollow formality. It does not permit a court to prejudge or provisionally award, on a preliminary basis, the

very contractual rights that are the subject of the arbitration. QRSkin asks this Court to prohibit Defendants from treating the Agreement as terminated, compel them to accept and fill future purchase orders, and enforce QRSkin's claimed exclusivity—months after the termination it now challenges and before any arbitration has proceeded. Compl. ¶¶ 62–65, 71.[1] These requests require first deciding that the termination was invalid, which is the very question the Agreement commits to the DIS tribunal, which is itself empowered to grant interim relief if warranted.[2]

For the reasons stated below, the Court should enforce the arbitration agreement, compel arbitration, and dismiss this action. In the alternative, the Complaint should be dismissed under Rules 12(b)(2) and 12(b)(6) as the Court lacks personal jurisdiction over Apaloo GmbH, and for failure to state a claim.

## BACKGROUND

### A. The Agreement.

In January 2020, Apaloo GmbH and QRSkin executed a License and Distribution Agreement governing QRSkin's distribution of certain Apaloo "Moskinto" products. Compl. ¶ 36. Broadly, the Agreement granted QRSkin specified rights to distribute products bearing Apaloo GmbH's brands and imposed corresponding obligations on QRSkin, including minimum annual turnover requirements. *See* Agreement, at § 8.2. The Agreement also prescribed the circumstances under which the parties could terminate their relationship and the consequences of termination. *Id.* at § 8. The following provisions agreed to by the parties are dispositive here:

i. **Supply.** Section 3.1 provides that Apaloo GmbH "shall supply the Licensee exclusively with the Licensed Products, *but the Licensee does not have a claim to a specific quantity within a specific period*. The supplying of the Licensed

[1] From the face of the Complaint, it is not clear whether Plaintiff has commenced a proceeding through DIS.

[2] *See DIS Arbitration Rules,* Art. 25.1, Interim Relief, Available online in English at https://www.disarb.org/en/tools-for-dis-proceedings/dis-rules (last accessed August 9, 2026).

Products by the Licensor is done according to availability of the Licensed Products." *Id.* at § 3.1 (emphasis added). Section 3.1 further states that the Licensee "has no claim to be supplied with the Licensed Products in their current form." *Id.*

ii. **Term and termination.** The Agreement was concluded for an initial five-year term, automatically renewing for two-year periods absent three months' notice. *Id.* § 8.1. Section 8.2 gave Apaloo GmbH a "special termination right" if specified annual minimum turnover figures—rising to USD 12,000,000 by the fifth contract year—"is not achieved," with termination "declared in writing no later than 31/01 of the following year" and effective "upon receipt by the Licensee." *Id.*, at § 8.2. Section 8.2 contains no diligence, best-efforts, or fault qualifier.

iii. **Post-termination.** Section 8.9 provides that at the end of the Agreement the Licensee's right to use the Licensed Brands terminates immediately, the Licensee may sell off products already delivered, products already ordered and paid for under Section 5.3 "shall be supplied and may also be sold off," and "[u]npaid orders are deemed to have been cancelled." *Id.* at § 8.9.

iv. **Dispute resolution and governing law.** Section 9.3 provides that all disputes "arising out of or in connection with this contract or its validity shall be finally settled in accordance with the Arbitration Rules of the German Arbitration Institute (DIS) *without recourse to the ordinary courts of law*." The tribunal is three members; the seat is Berlin, Germany; the language is German; and the merits are governed by "the non-standardized law of the Federal Republic of Germany specifically with the exclusion of the United Nations Convention on the International Sale of Goods." *Id.* at, § 9.3.

**B. The Complaint.**

Plaintiff alleges that on January 27, 2026, Apaloo GmbH's Managing Director delivered written notice exercising the Section 8.2 special termination right. Compl. ¶ 62. Plaintiff does not allege that it ever met the minimum turnover figures. To the contrary, Plaintiff affirmatively pleads that it did not. *Id.* at ¶ 52.

Plaintiff alleges that Apaloo GmbH delivered the outstanding December 2025 order in installments through approximately April 15, 2026, and accepted final payment on June 10, 2026. *Id.* at ¶ 64. Plaintiff alleges that it submitted a new order on June 1, 2026, and that Apaloo GmbH declined it on June 11, 2026 based on the termination. *Id.* at ¶ 65. Plaintiff further alleges it

discovered Moskinto product on a Walmart shelf "on or about February 15, 2026." *Id.* at ¶ 71. Plaintiff filed this action on July 13, 2026, months later.

QRSkin disputes Apaloo GmbH's right to terminate. Its Complaint alleges, among other things, that Apaloo waived its contractual termination rights through the parties' course of dealing, that QRSkin's failure to satisfy certain contractual turnover requirements resulted from alleged misrepresentations concerning Apaloo's production capacity, and that the termination is otherwise ineffective under German law governing standard form contractual provisions. Compl., at ¶¶ 78–79, 89. These allegations necessarily require interpretation and application of the Agreement to determine the validity and effect of Apaloo GmbH's termination. In other words, they require this Court—not the German arbitration forum—to make a determination of the merits.

QRSkin asserts the same underlying dispute against Apaloo Corp. Although Apaloo Corp. is not a signatory to the Agreement, QRSkin alleges that Apaloo Corp. and Apaloo GmbH acted together in connection with the conduct challenged in the Complaint and seeks to impose liability against both Defendants based upon the contractual rights QRSkin claims continue to exist under the Agreement. Compl. at ¶ 81–87, 100, 112. But QRSkin's own theory of liability against Apaloo Corp. is inseparably intertwined with the Agreement and the alleged misconduct of its signatory, Apaloo GmbH.

The Complaint pleads two counts—breach of contract (Count I) and breach of the implied covenant of good faith and fair dealing (Count II)—each against both Defendants. *Id.* at ¶¶ 95–114. Both counts rest on the same two acts: the January 27, 2026 termination and the refusal of the June 1, 2026 order. *Id.* at ¶¶ 99, 111. Plaintiff expressly disclaims any request for damages in this Court, stating that damages are "reserved for the DIS arbitral tribunal." *Id.* at ¶ 7.

## ARGUMENT

### I. The Court Should Compel Arbitration Under the Convention.

Although the Complaint acknowledges that the underlying dispute is subject to arbitration, QRSkin asks this Court to impose extensive mandatory relief while that arbitration proceeds. Specifically, QRSkin seeks an order prohibiting Defendants from treating the Agreement as terminated, requiring Defendants to continue accepting and filling QRSkin's purchase orders, enforcing QRSkin's claimed exclusive distribution rights, and restricting Defendants from supplying or servicing certain customers in the United States. Compl., at pp. 27-28, Prayer. That relief would require Defendants to continue performing the Agreement notwithstanding Apaloo GmbH's termination of it nearly seven months ago. And because the Agreement expressly provides that unpaid orders are cancelled following termination, the requested injunction necessarily depends upon QRSkin's contention that the termination was ineffective. In short, the central questions presented by QRSkin's Complaint are the same questions the parties agreed to arbitrate: whether Apaloo GmbH validly terminated the Agreement and, consequently, what contractual rights and obligations remain between the parties. The Agreement requires that question to be decided by the DIS tribunal.

#### *A. The Convention Governs the Parties' Agreement and Requires Enforcement of the Parties' Arbitration Agreement.*

The Federal Arbitration Act reflects a liberal policy favoring arbitration. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24 (1983). "[U]nder the Convention and Supreme Court and Circuit precedent, there is a strong presumption in favor of freely-negotiated contractual choice-of-law and forum-selection provisions, and this presumption applies with special force in the field of international commerce." *Lindo v. NCL (Bahamas) Ltd.*, 652 F.3d 1257, 1275 (11th Cir. 2011). Chapter 2 of the FAA ratifies and incorporates the

Convention. 9 U.S.C. § 201; *see also Czarina, L.L.C. v. W.F. Poe Syndicate*, 358 F.3d 1286, 1290 (11th Cir. 2004). Agreements governed by the Convention include those

> [A]rising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

9 U.S.C.A. § 202. Where an arbitration agreement falls under the Convention, "a court conducts a *very limited* inquiry." *Chemaly v. Lampert*, 174 F.4th 843, 850 (11th Cir. 2026) (emphasis added).

To compel arbitration, a court must find the Convention's four prerequisites are satisfied:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Id.* (quoting *Various Insurers v. Gen. Elec. Int'l Inc.*, 131 F.4th 1273, 1276 (11th Cir. 2025)).

If those four prerequisites exist, and "none of the Convention's affirmative defenses apply,[3] then the district court *must* order arbitration." *Id.* (emphasis added). Each prerequisite is satisfied here.

*First*, § 9.3 of the Agreement constitutes a written agreement to arbitrate. It requires "[a]ll disputes arising out of or in connection with this contract or its validity" to be "finally settled" under the DIS Arbitration Rules. *Second*, the Agreement requires arbitration in Berlin, Germany. *Id.* Germany is a signatory to the Convention. *See Outokumpu Stainless USA LLC v. Converteam*

---

[3] The limited affirmative defenses found in the Convention do not apply here.. *See Chemaly*, 174 F.4th, at 751, n.3 ("The Convention recognizes three categories of affirmative defenses, set out in Article II(3). A court need not enforce an agreement to arbitrate if the agreement is "null and void, inoperative or incapable of being performed.").

*SAS*, No. CV 16-00378-KD-C, 2017 WL 401951, at *3 (S.D. Ala. Jan. 30, 2017) (noting no dispute that "Germany is a signatory to the Convention"); *see also* New York Convention, Contracting States, *available online at* https://www.newyorkconvention.org/contracting-states (last accessed August 9, 2026).

*Third*, the Agreement concerns an indisputably commercial relationship: the licensing and distribution of Apaloo GmbH's products in the United States. *See Kastner v. Vanbestco Scandanavia, AB,* No. 5:14-CV-141, 2014 WL 6682440, at *4 (D. Vt. Nov. 25, 2014) ("The written agreement allows Vanbestco to manufacture, import, use, or sell products that would otherwise infringe the patents listed in the License Agreement, which includes the patents in suit. It is thus commercial in nature, and its subject matter is international, rather than solely domestic. As a result, the four basic requirements . . . for enforcement of arbitration agreements under the Convention are satisfied in this case."). *Finally*, the relationship is international. Apaloo GmbH is a German entity. The Agreement establishes a cross-border commercial relationship between Apaloo GmbH and QRSkin, selects Germany as the arbitral forum, and provides that German law governs the dispute.

***B. QRSkin's Claims Fall Squarely Within the Arbitration Provision.***

There can be little question concerning the scope of the Agreement to arbitrate. Section 9.3 does not identify discrete categories of arbitrable claims. It encompasses **"[a]ll disputes arising out of or in connection with this contract or its validity shall be finally settled in accordance with the Arbitration Rules of [DIS] without recourse to the ordinary courts of law."** *Id.* at § 9.3 (emphasis added). QRSkin's claims arise directly from the Agreement. QRSkin alleges that Apaloo GmbH improperly terminated the parties' distribution relationship, violated QRSkin's claimed exclusive distribution rights, failed to continue supplying products, and breached duties

allegedly arising from the parties' contractual relationship. Its requested relief likewise depends upon the continued enforceability of the Agreement.

Indeed, QRSkin's theory necessarily requires interpretation of several provisions of the Agreement. Among other things, the parties dispute whether Apaloo GmbH waived the right to rely upon those requirements, whether alleged representations concerning production capacity affect Apaloo GmbH's contractual rights, and whether Apaloo GmbH validly terminated the Agreement. The Agreement expressly commits such disputes arising from the contract and disputes concerning "its validity" to arbitration. *Id.* Whatever the ultimate merits of QRSkin's contractual theories, they are merits for the DIS tribunal to decide.

***C. Apaloo Corp. May Enforce the Arbitration Agreement as a Nonsignatory.***[4]

Equitable estoppel "allows a nonsignatory to enforce the provisions of a contract against a signatory in two circumstances." *Chemaly*, 174 F.4th at 856. "The first is when the signatory to the contract relies on the terms of the contract to assert his or her claims against the non-party." *Id.* "And the second is when the signatory raises allegations of interdependent and concerted misconduct by both the non-party and one or more of the signatories to the contract." *Id.*; *see also Realsec, Inc. v. Andeantrade, S.A.*, No. 15-20958-CIV, 2015 WL 7573868, at *3 (S.D. Fla. Nov. 24, 2015). Both apply here.

As Judge Scola once explained:

> [A]rbitration is appropriate when the signatory's claim against a non-signatory "makes reference to" or "presumes the existence of" the agreement. *MS Dealer*

---

[4] For the reasons discussed below, *infra*, Sec. III, this Court cannot consider a Motion to Compel Arbitration on behalf of Apaloo GmbH because it lacks personal jurisdiction over it. *See Reel Games, Inc. v. Euro Game Technology, Ltd.,* No. 0:24-CV-60713, 2025 WL 1555407, at *3, n.7 (S.D. Fla. June 2, 2025) (noting cases explaining that a Court must resolve issues concerning personal jurisdiction before deciding on a motion to compel arbitration). That limitation does not apply to Apaloo Corp., which does not contest this Court's personal jurisdiction and may therefore seek enforcement of the arbitration provision notwithstanding the Court's lack of personal jurisdiction over Apaloo GmbH.

> *Serv. Corp.,* 177 F.3d at 947; *Armas v. Prudential Sec., Inc.,* 842 So.2d 210, 212 (Fla. 3d DCA 2003). Second, equitable estoppel applies when the signatory raises allegations of concerted misconduct by both the non-signatory and one or more of the signatories to the contract. *See Bailey v. ERG Enter.,* 705 F.3d 1311, 1321 (2013) (citing *MS Dealer Serv. Corp.,* 177 F.3d at 947); *Marcus v. Fla. Bagels, LLC,* 112 So.3d 631, 633–34 (Fla. 4th DCA 2013). ***In other words, equitable estoppel precludes a party from "trying to have his cake and eat it too"—that is, using certain provisions of the contract to their benefit to help establish their claim while also attempting to avoid the burdens of the other provisions.*** *In re Humana Inc. Managed Care Litig.,* 285 F.3d 971, 976 (11th Cir.2002) (citation omitted). Defendants argue that both of these circumstances are present in this suit. The Court agrees.

*Gunson v. BMO Harris Bank, N.A.,* 43 F. Supp. 3d 1396, 1401 (S.D. Fla. 2014) (emphasis added); *see also Realsec, Inc.*, 2015 WL 7573868, at *3.

These principles apply with particular force here. Both counts seek to hold Apaloo Corp. liable under the Agreement to which it is not a party. *See generally* Compl.; *see also* Agreement. The Complaint alleges (i) substantially interdependent and concerted misconduct by Apaloo GmbH and Apaloo Corp.; (ii) that Apaloo GmbH controlled Apaloo Corp.; (iii) that the same individual served as managing director of one and president of the other; (iv) that Apaloo Corp. invoiced QRSkin; (v) that Apaloo Corp. acted as importer of record and handled shipping; and (vi) that both entities operated the Moskinto website together. Compl. ¶¶ 81-87. QRSkin's own theory is that Apaloo Corp. was merely "an agent" through which Apaloo GmbH acted and that both are jointly responsible. Compl. ¶¶ 100, 112. Those are classic allegations of interdependent and concerted conduct.

### *D. Plaintiff's Requested Injunction Does Not Preserve the Status Quo or Further the Arbitration.*

Plaintiff cannot avoid arbitration by simply characterizing its requested relief as necessary to preserve the "status quo." First, there is no suggestion that the DIS arbitration tribunal cannot enter the interim relief Plaintiff seeks here. It can. *See* DIS Arbitration Rules, Art. 25.1 ("Unless

the parties have agreed otherwise, the arbitral tribunal may, at the request of a party, order interim or conservatory measures, and may amend, suspend or revoke any such measure."). Second, Plaintiff's Complaint is not clear whether it has even commenced an arbitration before DIS. Compl. ¶ 7 (noting the arbitration is "pending and/or imminent"). In effect, Plaintiff seeks mandatory injunctive relief untethered to any arbitration.

Although a court may, in appropriate circumstances, issue interim relief on arbitrable claims, that authority is limited to relief necessary to preserve the status quo and the meaningfulness of the arbitration process. *See Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 376–78 (4th Cir. 2012); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1053–54 (4th Cir. 1985). Under the "hollow-formality" test applied in *Aggarao*, judicial intervention is warranted only where, absent an injunction, "the arbitral award when rendered could not return the parties substantially to the status quo ante." *Aggarao*, 675 F.3d at 376–77.

Plaintiff's requested relief does not serve that limited purpose. Apaloo GmbH terminated the Agreement on January 27, 2026. Compl. ¶ 62. Plaintiff alleges that Defendants thereafter completed delivery of the already-existing December 2025 order, rejected Plaintiff's new June 1, 2026 order on June 11, 2026. *Id.* ¶¶ 64–71. Plaintiff further alleges that it knew Apaloo was selling products through channels Plaintiff claims as its own as early as January 28, 2026. *Id.* ¶¶70-71. Plaintiff nevertheless waited until July 13, 2026 to file this action. Plaintiff does not seek to maintain an ongoing, undisputed contractual relationship during the pendency of an arbitration proceeding. It instead asks the Court months after termination and months after learning of the conduct it now challenges to restore the terminated relationship and affirmatively compel its continued performance.

Indeed, Plaintiff requests an order requiring Defendants to disregard the termination, accept and fill new purchase orders, refrain from selling to any customers within the United States, and honor Plaintiff's claimed exclusivity until the arbitration concludes. Compl. at 27–28. That relief is particularly inconsistent with the Agreement Plaintiff asks this Court to enforce. Section 8.9 expressly provides that, once the Agreement ends, Plaintiff's right to use the licensed brands terminates immediately. Agreement § 8.9. Section 3.1 further provides that even during the Agreement's existence, Plaintiff "does not have a claim to a specific quantity within a specific period," and supply remains subject to product availability. *Id.* § 3.1. Yet Plaintiff asks this Court to order Defendants to accept new orders and continue supplying products throughout the unknown arbitration. The requested injunction therefore would not merely preserve existing rights, but instead give Plaintiff rights that Defendants dispute presently exist and, in some respects, that the Agreement itself does not guarantee.

Courts reject precisely this use of interim judicial relief when the "requested injunction is not necessary to preserve the status quo" but "as a mandatory injunction" "would upset the status quo." *Ball v. Skillz Inc.*, No. 2:20-cv-00888-JAD-EJY, 2020 WL 6685514, at *6 (D. Nev. Nov. 12, 2020). Plaintiff presents no reason as to how the relief requested is necessary to protect the meaningfulness of the "pending and/or imminent" arbitration. A mandatory injunction in aid of arbitration, such as the one sought by Plaintiff here, "that goes beyond simply maintaining the status quo" by ordering a party to take affirmative action is "particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

The injunctive relief sought here would require this Court to prejudge and determine the questions at the center of the arbitrable claims. Specifically, determining whether Defendants must continue performing the Agreement necessarily requires the Court first to determine whether

Plaintiff is likely to prevail on its claim that Apaloo GmbH's termination was invalid. This is the very German law question the parties expressly agreed would be resolved by the DIS tribunal.

Nor has Plaintiff shown that denying its requested injunction would render the German arbitration a "hollow formality." The DIS Rules expressly authorize the arbitral tribunal to order interim or conservatory measures. *See* DIS Arbitration Rules, *supra* n.2. And any ultimate ruling that the termination was invalid can be accompanied by whatever contractual, equitable, or monetary relief the tribunal determines appropriate. Plaintiff therefore cannot show that an eventual award would be incapable of redressing its alleged injury, which is a prerequisite for extraordinary injunctive relief.

At most, federal courts have recognized a narrow judicial role during the interval before an arbitral tribunal is available to act. Plaintiff seeks nothing so limited. It does not state whether it has commenced the arbitration proceeding it claims this case is intended to aid, but still asks this Court to impose mandatory contractual obligations lasting until the DIS tribunal's final determination. Relief of that scope does not bridge a temporary gap until the arbitrators can act. It substitutes this Court's preliminary determination of the merits for the arbitral process the parties selected.

## II. Alternatively, The Complaint Should Be Dismissed.

Should the Court decline to compel arbitration, the Complaint should nevertheless be dismissed under Rule 12(b)(6). To survive dismissal, a complaint must plead sufficient facts to state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the Court accepts well-pleaded factual allegations as true, it need not accept legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678.

### *A. The Claims Against Apaloo Corp. Fail Because It Is Not a Party to the Agreement.*

Both counts should be dismissed against Apaloo Corp. for the threshold reason that Apaloo Corp. is not a party to the Agreement. Count I alleges breach of contract. To state such a claim, Plaintiff necessarily must establish the existence of a contract binding the defendant, a material breach, and resulting damages. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (applying Florida law). Yet the Agreement attached to the Complaint identifies Apaloo GmbH—not Apaloo Corp.—as the "Licensor." Agreement at p. 1. Apaloo Corp. did not execute the Agreement, and the Complaint identifies no contractual provision imposing any obligation upon it.

Plaintiff instead alleges that Apaloo Corp. should be liable because it acted as Apaloo GmbH's "agent" and because the two companies allegedly engaged in coordinated conduct. Compl. ¶¶ 81–87, 100. But agency does not transform an agent into a party to its principal's contract. Under Florida law, an agent for a disclosed principal is not liable for the contractual obligations of the principal. *See Philip Schwartz, Inc. v. Gold Coast Graphics, Inc.*, 623 So. 2d 819, 820 (Fla. 4th DCA 1993). Thus, Plaintiff's own theory that Apaloo Corp. acted merely as Apaloo GmbH's agent undermines rather than establishes contractual liability against Apaloo Corp.

Nor do Plaintiff's allegations of control erase the entities' separate corporate identities. The mere existence of a parent-subsidiary relationship is insufficient to support a claim and common ownership, officers, or commercial coordination does not alone establish alter ego. *See Sun Tr. Bank v. Sun Int'l Hotels, Ltd.,* 184 F. Supp. 2d 1246, 1268 (S.D. Fla. 2001). "[T]here is nothing inherently improper about corporations creating subsidiaries to perform specific functions . . . to hold otherwise would ignore the historical justification for the corporate enterprise system." *Id.* at

1269 (internal citations omitted). Florida law requires substantially more before disregarding corporate separateness, including improper conduct in the use of the corporate form. *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1120–21 (Fla. 1984). Plaintiff pleads insufficient facts establishing that Apaloo Corp. executed the Agreement, assumed GmbH's contractual obligations, or is otherwise bound as a contracting party. Count I therefore fails against Apaloo Corp.

Count II fails for the same reason. The implied covenant of good faith and fair dealing is not an independent source of contractual obligations. It instead attaches to the performance of an existing contract. *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151–52 (11th Cir. 2005). Because no contract exists between QRSkin and Apaloo Corp., there can be no implied contractual covenant between them. Both counts should therefore be dismissed against Apaloo Corp.

### ***B. Count I Fails Because the Agreement Expressly Permitted Apaloo GmbH to Terminate When QRSkin Failed to Satisfy the Minimum Turnover Requirement.***

Count I also fails against Apaloo GmbH because the Complaint and incorporated Agreement establish that GmbH exercised a termination right expressly granted by § 8.2. The pleaded facts, when read with together with the agreement, do not establish a breach. Critically, Plaintiff affirmatively alleges that it did not satisfy the contractual turnover requirement. Compl. ¶ 52. Plaintiff further alleges that on January 27, 2026, Apaloo GmbH delivered written notice exercising its § 8.2 termination right. *Id.* ¶ 62. Those allegations establish the factual predicates expressly required by § 8.2. Plaintiff attempts to avoid the Agreement's plain language by alleging that its inability to achieve the required turnover resulted from Apaloo GmbH's insufficient production capacity and prior representations concerning that capacity. But § 8.2 does not condition the turnover requirement on Apaloo GmbH's ability to supply whatever quantity Plaintiff

might request. To the contrary, § 3.1 expressly provides that QRSkin "does not have a claim to a specific quantity within a specific period" and that supply of licensed products is "according to availability." Agreement § 3.1. Plaintiff therefore asks the Court to impose a limitation on the termination provision that the parties did not include and that conflicts with another express provision of the Agreement.

Plaintiff's allegations concerning Apaloo GmbH's prior decisions not to exercise its termination right do not establish breach either. Section 8.2 grants a discrete termination *right* based upon each year's turnover, exercisable by January 31 of the following year. Agreement § 8.2. Plaintiff's conclusory invocation of German law does not plausibly establish otherwise. Plaintiff alleges that § 8.2 is invalid under German law because it appeared in a form agreement drafted by Apaloo. Compl. ¶¶ 35, 79. But the only federal court applying this German law found by Defendants rejected the proposition that a contractual provision becomes unenforceable merely because one party drafted it or the parties did not negotiate that particular provision. *See J.R. Simplot Co. v. McCain Foods USA, Inc.*, 713 F. Supp. 3d 904, 960–61 (D. Idaho 2024).

Apaloo GmbH's decision not to previously exercise a termination right does not amend the Agreement or eliminate a later termination right arising from a subsequent failure to meet the agreed turnover threshold. Accordingly, because Plaintiff's own allegations and the Agreement establish that the contractual condition triggering Apaloo GmbH's special termination right occurred, Count I fails to plausibly allege that exercising that express contractual right constituted a breach.

### *C. Plaintiff Cannot Use the Implied Covenant of Good Faith and Fair Dealing to Eliminate Apaloo GmbH's Express Contractual Termination Right.*

The implied covenant of good faith and fair dealing cannot be used "as a source of a breach when all other terms have been performed pursuant to contract requirements." *Hospital Corp. of*

*Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573, 575 (Fla. 4th DCA 1998). Nor may it "add an obligation to the contract which was not negotiated by the parties and not in the contract." *Id.*

That is precisely what Count II attempts to do. Section 8.2 expressly grants Apaloo GmbH a "special termination ***right***" if the specified annual turnover "is not achieved." Agreement § 8.2. Plaintiff admits that it failed to achieve the required turnover. Compl. ¶ 52. Yet it alleges that GmbH violated an implied covenant by exercising the termination right because GmbH allegedly contributed to Plaintiff's inability to meet the turnover threshold and later sought to sell products directly in the United States. Compl. ¶¶ 105–114. Whatever Plaintiff thinks of GmbH's motives, the implied covenant cannot prohibit conduct the Agreement expressly permits. Otherwise, the implied covenant would convert an unconditional termination right into a conditional one—permitting termination only if QRSkin failed to meet the turnover requirement for reasons deemed sufficiently attributable to QRSkin. Nothing in § 8.2 says that.

The claim also conflicts with § 3.1. Plaintiff's theory effectively requires GmbH to have supplied enough product for QRSkin to achieve the minimum turnover before GmbH could invoke § 8.2. But the parties expressly agreed that QRSkin had no right "to a specific quantity within a specific period" and that supply remained subject to product availability. Agreement § 3.1. The implied covenant cannot be invoked to create the very supply obligation the express contract disclaims. Count II therefore should be dismissed.

### ***D. Plaintiff's Requested Injunction Seeks Contractual Rights the Agreement Does Not Provide.***

Assuming Plaintiff could state a claim concerning the termination, the mandatory injunction requested in the Complaint extends beyond the contractual rights it seeks to enforce. Plaintiff asks the Court to require Defendants to continue accepting and filling future purchase orders throughout the litigation and arbitration. Compl. at 27–28. But § 3.1 expressly states that

QRSkin has no contractual right to "a specific quantity within a specific period" and that supply is subject to availability. Agreement § 3.1. More fundamentally, § 8.9 provides that after termination only products already ordered and paid for must be supplied, while "[u]npaid orders are deemed to have been cancelled." Agreement § 8.9. The injunction thus would not merely enforce an express contractual obligation. It would impose an affirmative obligation to accept and fulfill future orders that the Agreement does not guarantee even while operative and expressly disclaims following termination.

The same defect applies to Plaintiff's attempt to obtain specific performance against Apaloo Corp. Apaloo Corp. is not a party to the Agreement and undertook none of the obligations Plaintiff asks this Court to specifically enforce against it. Accordingly, even apart from arbitration, the Complaint fails to state a basis for the contractual relief it seeks.

## III. ALTERNATIVELY, THE CLAIMS AGAINST APALOO GMBH SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION.

Plaintiff bears the burden of establishing a prima facie basis for personal jurisdiction over Apaloo GmbH. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). Because Plaintiff invokes diversity jurisdiction, personal jurisdiction ordinarily must comport with both Florida's long-arm statute and the Due Process Clause. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626–27 (11th Cir. 1996). QRSkin's allegations satisfy neither.

### *A. Apaloo GmbH Is Not Subject to General Jurisdiction in Florida.*

The Complaint's principal jurisdictional theory is that Apaloo GmbH engages in "substantial and not isolated activity within Florida" under Fla. Stat. § 48.193(2). Compl. ¶ 29. But even assuming that conclusory allegation satisfies the statutory language, constitutional due process does not permit the exercise of general jurisdiction here. A corporation is ordinarily subject to general jurisdiction only where its contacts with the forum are so continuous and systematic as

to render it "at home," in its place of incorporation and principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137–39 (2014). Outside those forums, general jurisdiction exists only in the exceptional case. *Id.* at 139, n.19. The Complaint affirmatively alleges that Apaloo GmbH is organized in Germany and maintains its principal place of business there. Compl. ¶ 11. It does not allege that GmbH maintains an office in Florida, owns property here, or is otherwise "at home" in Florida. Indeed, the Agreement itself points away from Florida by selecting Berlin as the arbitral forum, German as the arbitral language, and German law as governing the merits. QRSkin therefore fails to establish general jurisdiction over Apaloo GmbH.

QRSkin alternatively alleges that Apaloo Corp.'s Florida contacts should be attributed to GmbH because Corp. supposedly acts as GmbH's agent. Compl. ¶¶ 29, 81–87. But the existence of a subsidiary or affiliate in Florida does not itself subject the foreign parent to jurisdiction here. "Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there." *Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1274 (11th Cir. 2002) ("In order to establish jurisdiction, Plaintiff must persuade the court that the Florida subsidiaries are the entities through which the Sun Defendants conduct *substantial* business activity in Florida."); *see also Sanchez v. Team Health, LLC*, No. 18-21174-CIV, 2021 WL 4990803, at *6-7 (S.D. Fla. Mar. 31, 2021).

The jurisdictional allegations here are similar to those rejected by the Supreme Court in *Daimler*. There, the plaintiff sought to attribute the California contacts of a domestic subsidiary to its German parent. *Id.* at 121. Even assuming those contacts could be attributed, the Supreme Court held that exercising general jurisdiction over the German parent would violate due process because the parent was not "at home" in California. 571 U.S. at 134–39. As Judge Moore has explained, reliance on agency theory to establish general jurisdiction is "dubious given the decisions in

*Daimler and Goodyear*." *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1338–39 (S.D. Fla. 2016) (explaining that reliance on an agency theory for general jurisdiction is "dubious" after *Daimler* and *Goodyear*)(collecting cases); *see also Twinstar Partners, LLC v. Diamond Aircraft Indust., Inc.*, No. 11-cv-61684, 2014 WL 4102260, at *5 (S.D. Fla. Aug. 18, 2014) (Domestic entity acting as a sales conduit for foreign corporation insufficient to establish general jurisdiction).

***B. QRSkin Does Not Allege Suit-Related Conduct by Apaloo GmbH Purposefully Directed at Florida.***

Specific jurisdiction fares no better. Specific jurisdiction requires that the plaintiff's claims arise out of or relate to the defendant's contacts with the forum and that the defendant purposefully availed itself of conducting activities there. *See Louis Vuitton*, 736 F.3d at 1355 (noting the due process three-part test). The Complaint does not allege that the Agreement was negotiated in Florida, executed in Florida, or performed principally in Florida. QRSkin is a Texas corporation. Apaloo GmbH is German. The Agreement created a nationwide United States distributorship, selected German substantive law, and provided for arbitration in Berlin.

More importantly, the alleged acts giving rise to this lawsuit are not alleged to have occurred in Florida. QRSkin identifies the operative breach as Apaloo GmbH's January 27, 2026 termination of the Agreement and its subsequent refusal to fill QRSkin's June 1 order. Compl. ¶¶ 62, 65, 99, 111. The Complaint does not allege that GmbH made either decision in Florida, transmitted the termination from Florida, negotiated the Agreement here, or directed the allegedly wrongful conduct specifically toward Florida. The fact that the Agreement contemplated sales throughout the United States does not itself establish purposeful availment of Florida. Nor do QRSkin's own downstream relationships with national retailers establish Florida contacts attributable to GmbH. The relevant inquiry focuses on the defendant's own contacts with the forum, not contacts created by the plaintiff or third parties. *See Walden v. Fiore*, 571 U.S. 277,

284–86 (2014) ("the relationship must arise out of contacts that the defendant *himself* creates with the forum State."). In sum, the Complaint alleges at most a German company's participation in a nationwide commercial relationship with a Texas distributor. That is insufficient to establish that Apaloo GmbH purposefully availed itself of Florida as the forum for adjudicating this German-law contractual dispute.

Requiring a German corporation to litigate that dispute in Florida, where neither contracting party is at home and where the Complaint identifies no meaningful suit-related conduct by Apaloo GmbH, would impose a substantial burden while advancing little legitimate forum interest. The parties themselves selected Germany as the locus for resolving their contractual disputes. Due process does not permit QRSkin to manufacture Florida jurisdiction merely by adding GmbH's Florida affiliate as a co-defendant. The claims against Apaloo GmbH should therefore be dismissed under Rule 12(b)(2).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court (1) compel arbitration of QRSkin's claims before the DIS tribunal in Berlin, Germany, (2) dismiss Plaintiff's Complaint; and (3) grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Austin M. Krtausch*
Christopher D. Cathey (FBN 663255)
Lorena Friger (FBN 1007884)
Austin M. Krtausch (FBN 1025521)
Offit Kurman, P.A.
100 Southeast Third Ave., 10th Floor
Fort Lauderdale, FL
Telephone: (954) 353-8235
christopher.cathey@offitkurman.com

lorena.friger@offitkurman.com
austin.krtausch@offitkurman.com
Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was filed with the Court's CM/ECF filing system this 10th day of August, 2026, which shall serve a copy of the foregoing to counsel for Plaintiff, Timothy A. Kolaya, Esq., Matthew DellaBetta, Esq., **STUMPHAUZER KOLAYA & SLOMAN, PLLC**, 2 S. Biscayne Boulevard, Suite 1600, Miami, Florida 33131, tkolaya@sknlaw.com, mdellabetta@sknlaw.com.

*/s/ Austin M. Krtausch*